FRANCIS E. RINEHART, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rinehart v. Commissioner
Docket No. 6514-78.
United States Tax Court
T.C. Memo 1983-184; 1983 Tax Ct. Memo LEXIS 607; 45 T.C.M. (CCH) 1185; T.C.M. (RIA) 83184; April 4, 1983. Francis E. Rinehart, pro se. Joan Ronder Domike and Deborah B. K. L. Rosensweig, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioner's Federal income tax and additions to the tax under section 6653(b) [1] as follows: Additions to
Years
Tax Deficiencies
the Tax [2]
1969
$2,915.20
$7,949.20
1970
3,447.73
14,120.36
1971
41,070.64
27,698.10
1972
9,639.78
*610 The issues for decision are: 1. Whether respondent has sustained his burden of proof to establish fraud by clear and convincing evidence for each of the years involved in this case so that assessment of the tax is not time barred. This in turn may give rise to two subsidiary issues: (a) If respondent has established fraud for any or all of the years here involved, whether the amended returns filed by petitioner were nonfraudulent; and (b) If the amended returns for any or all of the years here involved were nonfraudulent, whether the filing of those amended nonfraudulent returns commenced the running of the three-year limitations period of section 6501(a) so that assessment of the tax for each such year is still time barred; 2. Whether the six-year limitations period of section 6501(e) applies to the year 1971 because of substantial omissions of gross income from both the original and amended return filed for that year so that that year remains open for assessment of the tax; and 3. If so, whether petitioner has sustained his burden of proof to establish that respondent's determination of the deficiency for 1971 was incorrect. FINDINGS OF FACT Some of the facts *611 have been stipulated and are so found. The stipulation of facts, the supplement to the stipulation of facts, and the exhibits attached thereto are incorporated herein by this reference. Petitioner resided in Easthampton, Massachusetts, when he filed his petition in this case. He timely filed his Federal income tax returns for 1969 through 1972, inclusive, with the Internal Revenue Service at Andover, Massachusetts. Petitioner, an experienced attorney familiar with the tax laws, prepared the joint income tax returns for himself and his wife for the years in issue without assistance from anyone. [3]
Petitioner was graduated from Harvard Law School in 1951. He took tax and accounting courses in law school. After his graduation he worked in the tax department of the New York City law firm of Davis Polk until July 1957. From 1957 until 1971, he was counsel for Newmont Mining Corporation at its principal *612 offices in New York City. Petitioner reviewed Newmont's tax returns and prepared protests to the Internal Revenue Service with respect to the corporation's Federal income tax liability for the years 1960 through 1965. Newmont Mining Corporation (Newmont) is listed on the New York Stock Exchange. It engages in mining operations all over the world. Newmont had a number of subsidiaries during the years in issue including Magma Copper Company, Newmont Oil Company, Canadian Export Gas and Oil, and Magma Arizona Railroad. From 1969 through 1971 petitioner was on the board of directors of Magma Copper Company, Newmont Oil Company, and Canadian Export Gas and Oil. In 1971 he was also on the board of directors of Magma Arizona Railroad. In 1970 and 1971 petitioner received from those companies director's fees that he failed to report on his income tax returns. While the fees were paid to petitioner in cash, each company furnished petitioner a Form 1099 or a statement showing the director's fees paid to him for the year. In the fall of 1971 petitioner left Newmont and began working for Cypress Mines Corporation in Los Angeles. He worked and was paid under a contract with Cypress *613 Mines until June 1972. Cypress reimbursed petitioner for various expenses he incurred, and petitioner deducted these reimbursed expenses on his 1972 tax return. In November 1971 Revenue Agent Richard Paluck was assigned petitioner's 1969 income tax return for audit. Later the audit was expanded to include the years 1970, 1971, and 1972. Paluck made several attempts to reach petitioner by telephone, but it was not until April 6, 1972 that he made any contact with petitioner. Paluck obtained from petitioner's banks and brokers copies of his bank and brokerage statements. During the course of his investigation, Paluck also contacted several third parties to obtain information that petitioner did not provide. Petitioner was upset by these third-party contacts. On July 17, 1973, petitioner wrote the District Director requesting both that the audit be expedited and that there be no further third-party contacts before asking petitioner for the information.The Director denied the request citing petitioner's unavailability as both the reason for the delay and the reason for getting information from third parties. On October 31, 1973, petitioner received a telephone call from a special *614 agent stating that the case had been turned over to him for investigation for possible tax fraud. Respondent's agent made adjustments to petitioner's original returns as follows: [4]
1969
1970
1971
1972
Gross receipts
$15,000.00 $30,500.00 $64,762.65 Director's fees
2,400.00 1,520.00 State tax refund
2,778.29 3,772.34 1,336.70 Stock options
8,884.57 10,174.93 20,155.73 Short term capital
gain on stock
options
1,153.48 248.54 144.87 Schedule D - long
term capital gain
(4,819.54)
(5,211.73)
(10,150.80)
Miscellaneous income
(693.60)
Interest income
125.65 669.37 Depreciation
1,806.12 1,806.12 1,806.12 2,031.05 Other business expenses
7,372.99 2,903.88 5,618.06 27,610.43 Schedule F - farm
expense
3,530.72 3,392.38 3,570.31 3,828.44 Contributions -
Schedule A
6,774.55 8,057.12 8,052.63 Taxes - Schedule A
50.00 1,000.00 (2,264.31)
Interest expense -
Schedule A
(1,150.61)
351.41 (1,206.31)
Medical expense
1,175.33 56.05 511.00 Total adjustments
$32,978.34 $56,791.68 $99,095.91 $40,569.00 *615 On June 10, 1974, petitioner filed a first amended return for 1969. On June 18, 1974, petitioner filed a first amended return for 1970. On September 30, 1974, petitioner filed second amended returns for 1969 and 1970. On October 7, 1974, and October 15, 1974, petitioner filed amended returns for 1971 and 1972, respectively. Petitioner testified that he filed the amended returns "in an honest attempt, in a genuine effort, to file a nonfraudulent return." On the amended returns, petitioner therefore eliminated most of the deductions that he had claimed on his original returns and reported most of the items that the revenue agent had asserted were items of income. Petitioner's *616 total tax liability for each of the years involved as reflected on his original returns and amended returns and as determined by respondent in the statutory notice were as follows: 1969
1970
1971
1972
Original return
$5,244.71
$5,060.64
$8,744.80
$6,634.44
First amended return
12,795.54
6,891.17
23,070.36
26,774.73
Second amended return
18,227.91
29,853.62
Notice of deficiency
21,143.11
33,301.35
64,141.00
25,914.00
The amended returns filed by petitioner were nonfraudulent and except for the year 1971 the amended returns were substantially correct. [5]
*617 In April 1977 a Two-Count Information was filed against petitioner in the Federal District Court in Boston, alleging, pursuant to section 7206(1), that petitioner did willfully and knowingly make and subscribe to a joint Federal income tax return on behalf of himself and his wife which he did not believe to be true and correct as to every material matter. The First Count was for 1970 and the Second Count was for 1971. Count 1 charged that petitioner reported for 1970 taxable income of $21,741.29 when he knew and believed that his taxable income was $67,266.32. Count 2 of the information charged that he reported for 1971 taxable income of $32,201.91 when he knew and believed that his taxable income was $83,719.47. Petitioner waived an indictment and, on April 11, 1977, pleaded guilty to Count 2 of the information. The Government later dismissed Count 1. Petitioner was fined $5,000 and sentenced to one year's imprisonment. The jail sentence was suspended and petitioner was placed on probation for one year. [6]
*618 Count 2 of the information charged that petitioner had omitted $51,517.56 of taxable income. This omission was composed of four specific items: legal fees from the Estate of Boyce Downey of $36,375.42; director's fees of $1,220; a New York State income tax refund of $3,772.34; and gain of $10,149.80 from the sale of stock acquired by him as a participant in a qualified stock option plan. The legal fees from the Estate of Boyce Downey will be discussed in detail below. The director's fees omitted in 1971 follow the same pattern as the director's fees omitted the year before, as discussed above. The situation in regard to the omission of the state tax refund also follows a pattern evident in each of the years 1969 to 1972 in that petitioner each year deducted the full amount of state tax paid or withheld that year and failed to report in income the refund received each year from the prior year's overpayment of such taxes. The situation in regard to the stock options is somewhat more complex. In years prior to those before the Court, petitioner had reported such gains on the stock options as ordinary income but had reported them on a Schedule C and improperly labeled them as *619 receipts from his private practice of law and had attempted to deduct various alleged business expenses against that income. In the years 1969-1971, petitioner reported the gain from the stock options on Schedule D but in each instance used the date of the granting of the option rather than his date of exercising the option as his date of acquisition. On each occasion that petitioner exercised the option, he wrote a letter to the company stating his intention to exercise the option. In 1971, for example, he exercised his option rights on eight separate occasions. Each year stock was acquired by petitioner on several different dates, but petitioner in each instance used the date on which the stock option was originally granted to him, September 9, 1966. Petitioner testified that he simply picked up the wrong date and continued using that same date thereafter. Thus using this erroneous date, petitioner improperly claimed long-term capital gain rather than short-term capital gain each year. For each of the years before the Court, petitioner has conceded those adjustments relating to the following items: director's fees, New York State tax refund, stock options, short-term capital *620 gain on stock options, interest expense, and medical expense. Petitioner disputes the fraud addition for each year and either concedes or has failed to carry his burden of proof as to certain items of omitted gross income. On his original 1969 return petitioner did not report an amount of $15,000 that he received that year for work on the Casperson Estate. Petitioner did not report the $15,000 because he determined that he had over the years incurred expenses in connection with that estate that amounted to or exceeded that sum. Some of those expenses had been claimed on his tax returns for earlier years but had been disallowed by respondent on audit of those returns. On his first amended return for 1969, petitioner included the $15,000 in gross income and deducted some $9,179.11 expenses that had been disallowed on audit in previous years. On his second amended return for 1969, petitioner eliminated those expense deductions. On his original 1970 return petitioner did not report an amount of $30,500 that he received from the Heart and Lung Foundation for reimbursement for expenses he had allegedly incurred for work performed for that organization over the years. On his second *621 amended return for 1970, petitioner reported that item as income and did not claim any offsetting expense deductions. For the year 1971 petitioner argues that the items remaining in issue are as follows: Gross receipts from law practice
$64,762.65
Downey Estate
$49,762.65
Wessel Trust
15,000.00
Deductions
19,051.61
Depreciation
1,806.12
Business Expense
5,618.06
Farm Expense
3,570.31
Contributions
8,057.12
1. Gross Receipts
Respondent determined that petitioner received gross receipts of $64,762.65 as compensation for legal services rendered by him. The source of the income was compensation for work done in connection with the Estate of Boyce Downey and the Wessel Trust. a. Downey Estate
Beginning in 1954, one of petitioner's clients was Boyce Downey, the granddaughter of the founder of Newmont.She died in 1964. Three executors were named in her will: Morton Downey, her husband; Fred Searls, Jr., her chief financial advisor; and Lawrence X. Cusack, the attorney who drafted her will. The executors retained three attorneys including petitioner to assist in the administration of the estate.Morton Downey recommended two *622 of the attorneys, Arthur Stryker and Adrian Maher. Petitioner was recommended by the executor representing Boyce Downey's children. The will was probated in Connecticut. There was a problem in connection with the Federal estate tax because the estate contained many shares of Newmont stock. Petitioner prepared the Federal estate tax return and represented the estate before the appellate division of the Internal Revenue Service. By his knowledge of taxes, petitioner enabled the estate to save several hundred thousand dollars in taxes in handling the redemption of the Newmont stock from the estate. Petitioner received partial payment for his services from the estate of $25,000 in 1964, $20,000 in 1965, and $50,000 in 1967. [7]
A dispute arose concerning the division of the total attorneys' fee among the three attorneys. *623 Mr. Stryker and Mr. Maher argued that there had been an agreement to divide the fees 40 percent to petitioner, 40 percent to Stryker, and 20 percent to Maher. Petitioner argued that the fees were to be divided according to the value of the services performed and that petitioner was entitled to receive considerably more than 40 percent of the total. He argued that the payments he had already received were subject to a refunding agreement and subject to court approval and final allowance of the total fee after the estate was completely administered.
Petitioner had also provided legal services to Boyce Downey and her two children (a daughter, Catherine H. Cook, and a son, Christian Hohenlohe), to a guardianship for her son, and to the three testamentary trusts created by the will of Boyce Downey for her husband and children. The services to the trusts were performed between May 21, 1964 and April 17, 1969, and the other services were performed during part of this period or before 1964. Petitioner disputed his compensation for those services too. On April 17, 1969, petitioner submitted a bill for $250,000 to the estate, trusts, and children for services rendered and disbursements *624 made. Against this total he credited the $95,000 he had received earlier.
In June 1969 petitioner began a proceeding which was in part an accounting of the estate. He contested the division of the attorneys' fees. In January 1971, the probate court judge decided against petitioner on the grounds that there had been an agreement among the attorneys to divide the fees: 40 percent to petitioner, 40 percent to Stryker, and 20 percent to Maher. Petitioner did not appeal that decision. He merely filed an affidavit with the probate court stating that the decedent was not domiciled in Connecticut and that he was entitled to be paid more than either of the other lawyers involved. [8]
On February 22, 1971, petitioner received a check in the *625 amount of $36,375.42 representing final payment of attorney's fees from the estate in accordance with the decree of the probate court. [9] On that date, he also received three checks totaling $13,387.23 as follows: $4,778.57 written by the trustees for Morton Downey, $4,304.33 written by the trustees for Catherine H. Cook, and $4,304.33 written by the trustees for Christian Hohenlohe. [10] Petitioner refused to accept any of the checks and on June 16, 1971, returned them to Lawrence Cusack, one of the executors of the estate and a trustee of all three trusts. The trustees of the three trusts asked the probate *626 court for instructions and were directed to place the amounts in separate savings accounts for petitioner. The money was deposited in the latter part of 1971 and has been accumulating interest. Petitioner has been advised from time to time that the money is available but he still has not accepted it. The executors of the Estate of Boyce Downey filed a petition in the New Haven Probate Court to have a special administrator appointed to hold the $36,375.42 since it was the only account left unsettled in the estate. The probate court appointed Jack H. Evans as administrator d.b.n. c.t.a. to hold the money in petitioner's behalf. The executors of the estate drew a check dated September 30, 1971, payable to the order of Jack Evans as administrator C.T.A.D.B.N. in the amount of $36,375.42. The voucher stated that the distribution was to be payable to petitioner in accordance with the New Haven Probate Court decree. Evans notified petitioner that the funds were available to him at any time upon his written request. At the time of the trial, petitioner still had not accepted any of this money. b. Wessel Trust
On May 27, 1970, petitioner entered into a trust agreement with *627 Winifred Marguerite Wessel under which he was appointed trustee. Petitioner had control over a checking account that was opened for the Wessel Trust at the Chemical Bank & Trust Co. in New York City. In 1971 petitioner wrote three checks totaling $15,000 payable to himself on the Wessel Trust account, and deposited those checks in his personal account at Barclays Bank. The checks were dated January 19, November 17, and December 17, 1971, and each was for $5,000. Petitioner testified that the first $5,000 was for distributions that he made to Robert Wessel, one of the beneficiaries, and that the second two checks were loans that were repaid to the trust. Petitioner so testified from notes he prepared sometime during the audit in this case. However, no original trust records or other documentation to support his testimony was ever provided, although the Court kept the record open after the trial to permit petitioner to add such materials to the record. 2. Deductions
On his original Federal income tax returns for the years 1969-1972, petitioner claimed deductions for depreciation, business expense, farm expense, and charitable contributions, which were disallowed on audit. *628 Petitioner eliminated all of those claimed deductions on his amended returns. In his petition to this Court, petitioner claimed that he was entitled to all of these deductions, but at the trial he seemed to disclaim the issues and offered no evidence in regard to most of the items. On brief petitioner again seems to claim these deductions and relies on certain materials outside the record, which we have disregarded as improper ex parte materials. Rule 143(b), Tax Court Rules of Practice and Procedure.
a. Depreciation
On his original returns, petitioner claimed depreciation on his automobile. The deduction was computed by using straightline depreciation over a four-year period. Petitioner claimed 100 percent business use of the automobile when at least some of the use was personal. The automobile was garaged and most of the automobile repairs were done near petitioner's residence in Massachusetts. Petitioner eliminated his claim for automobile depreciation on his amended returns but reasserted the claim in his petition and his brief. [11] There is no evidence in the record establishing the business usage of this automobile. *629 b. Other Business Expenses
On Schedule C of his original returns, petitioner listed his wages from Newmont and/or Cypress Mines Corporation as gross receipts and claimed business expenses as follows: 1969
$7,107.57
1970
2,903.88
1971
5,618.06
1972
27,610.18
For example, the business expenses claimed for 1971 were as follows: Bar Association dues
$ 17.50
Court and other fees
574.75
Books and supplies
148.16
Telephone
489.59
Florist
29.50
Club expense
1,317.63
Travel
861.30
Car expense
2,179.63
Total
$5,618.06
The claim for telephone expense represented 50 percent of his Massachusetts telephone expense. The club expense was composed of the following: Canadian Club of New York, $541.72; Harvard Club of New York, $620.91; and Northampton Country Club, $155. The automobile expense deduction was claimed for about half of his total expenditures for registration, insurance, repairs, gas and oil, cash purchases, tolls, and parking. All of these expenses were disallowed on audit on the grounds that they were not substantiated and that since petitioner was employed by Newmont Mining and Cypress Mines in 1971, he was not involved *630 in a separate trade or business and thus the expenses were not properly deductible by him. Petitioner has not claimed that these expenses for any of the years are employee business expenses connected with his employment with Newmont or Cypress Mines. On his amended returns for these years that he filed in 1974, petitioner eliminated all of these claimed business expense deductions. Petitioner reasserted his claim for all of these deductions in his petition and in his brief. The record does not establish whether and, if so, to what extent any of these items might be properly deductible as business expense, as employee business expense, or as miscellaneous itemized deductions. Moreover, there is no evidence substantiating the payment of any of these amounts. c. Farm Expenses
Petitioner claimed farm expenses for each year in connection with his ownership of a horse. Respondent disallowed the claims on the ground that owning the horse was a hobby and not an activity entered into for profit. Petitioner's original returns had claimed deductions for farm loss each year as follows: 1969
$3,530.72
1970
3,392.38
1971
3,570.31
1972
3,828.46
The amended *631 returns filed in 1974 eliminated these claims. Petitioner reasserted these claims in his petition and again in his post-trial brief. There is no evidence establishing a profit objective and there is no evidence substantiating any of the amounts claimed. d. Contributions
The charitable contributions in issue here were allegedly made to Cooley Dickerson Hospital and the Heart and Lung Foundation in the following amounts: 1970
1971
1972
Cooley Dickerson
$801.65
$994.12
$297.02
Heart and Lung
5,972.90
7,063.00
7,775.61
Petitioner had done the legal work to establish the Heart and Lung Foundation in 1957, and had been involved with the Foundation as a director and secretary since its inception. For the year 1971, for example, petitioner computed his contributions deduction to Cooley Dickerson Hospital by adding one-fifth of his total car expenses and one-eighth of his total Massachusetts telephone bill.Petitioner computed his contributions deduction to the Heart and Lung Foundation by adding 100 percent of his New York telephone expense of $243 and $6,820 for labor he allegedly hired. Petitioner eliminated these claims for charitable *632 contributions deductions on his second amended return for 1970 and on his first amended returns for 1971 and 1972. In his petition and in his brief he again asserted that he was entitled to these deductions. There is no evidence in the record substantiating the amounts claimed. The notice of deficiency in this case was issued April 7, 1978, more than three years after petitioner filed amended returns for each of the years in issue. Petitioner filed his original 1971 return (dated April 6, 1972) on or before April 15, 1972, and filed his amended return for that year on October 4, 1974. OPINION Respondent determined deficiencies and additions to tax under section 6653(b) [12] for the years 1969 through 1972.Petitioner has pleaded the statute of limitations pursuant to Rule 39, Tax Court Rules of Practice and Procedure, arguing that the statute of limitations bars the assessment of taxes for all years. *633 Since the notice of deficiency was issued more than three years after petitioner filed his returns, assessment of any tax appears to be barred by the three-year limitations period of section 6501(a), [13] unless respondent proves fraud. If respondent establishes that petitioner's returns were false or fraudulent with the intent to evade tax within the meaning of section 6501(c) (1), [14] the tax may perhaps be assessed "at any time" without regard to any limitations period. Only if respondent proves such fraud [15] must we consider the effect of petitioner's filing of amended returns for those years. Since we have found as a fact that the amended returns were nonfraudulent, their filing may, under this Court's ruling in Klemp v. Commissioner,77 T.C. 201 (1981), commence the running of the three-year limitations period of section 6501(a) and assessment of any tax may still be time barred since the deficiency notice was issued more than three years after the amended returns were filed. We must then determine whether the year 1971 may be open under the six-year limitations period of section 6501(e). [16] If that year is still open, we must then consider whether petitioner *634 has sustained his burden of proof to show that respondent's determination of the deficiency for 1971 was incorrect. Since we do not reach most of these issues unless respondent proves fraud, we will first address the fraud issue. *635 The existence of fraud is an issue of fact to be determined from a consideration of the entire record. Stratton v. Commissioner,54 T.C. 255, 284 (1970); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). Respondent has the burden of proving fraud and must affirmatively establish its existence by clear and convincing evidence. Section 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Stone v. Commissioner,56 T.C. 213, 220 (1971); Beaver v. Commissioner,55 T.C. 85, 92 (1970). Fraud means actual, intentional wrongdoing, and the intent required is the the specific purpose to evade a tax believed to be owing. Wilson v. Commissioner,76 T.C. 623, 634 (1981); Candela v. United States,635 F. 2d 1272 (7th Cir. 1980); Stoltzfus v. United States,398 F. 2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Mitchell v. Commissioner,118 F. 2d 308 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939), followed on remand 45 B.T.A. 822 (1941). Respondent must show that the taxpayer intended to evade *636 taxes by conduct calculated to conceal, mislead, or otherwise prevent the collection of the taxes. Stoltzfus v. United States,supra;Marcus v. Commissioner,70 T.C. 562, 577 (1978), affd. without published opinion 621 F. 2d 439 (5th Cir. 1980). Fraud is never imputed or presumed and courts should not sustain findings of fraud upon circumstances which at most create only suspicion. Green v. Commissioner,66 T.C. 538, 550 (1976); Olinger v. Commissioner,234 F. 2d 823, 824 (5th Cir. 1956); Davis v. Commissioner,184 F. 2d 86, 87 (10th Cir. 1950). Mere suspicion does not prove fraud, and the fact that we do not find the taxpayer's testimony wholly credible is not sufficient to establish fraud. Cirillo v. Commissioner,314 F. 2d 478, 482 (3d Cir. 1963), affg. in part and revg. in part a Memorandum Opinion of this Court; Shaw v. Commissioner,27 T.C. 561, 569-570 (1956), affd. 252 F. 2d 681 (6th Cir. 1958); see also DeClercq v. Commissioner,T.C. Memo. 1982-386. In this case respondent has shown numerous instances *637 in which petitioner, an experienced attorney familiar with the tax laws, has omitted items of income or claimed deductions on his tax returns under rather peculiar or suspicious circumstances. In addition respondent has pleaded and relies upon the doctrine of collateral estoppel as to the year 1971. For the taxable year 1971, petitioner pleaded guilty under section 7206(1) [17] to willfully and knowingly making and subscribing to a joint Federal income tax return on behalf of himself and his wife, which he did not believe to be true and correct as to every material matter in that he reported for 1971 taxable income of $32,201.91 when he knew and believed that his taxable income was $83,719.47. For purposes of applying the doctrine of collateral estoppel, there is no difference between a conviction based on a guilty plea, as here, and a conviction after a trial on the merits. Plunkett v. Commissioner,465 F. 2d 299, 305 (7th Cir. 1972), affg. a Memorandum Opinion of this Court; Goodwin v. Commissioner,73 T.C. 215, 223 (1979); Arctic Ice Cream Co. v. Commissioner,43 T.C. 68, 75 (1964). Respondent argues, and correctly so, that *638 as a result of petitioner's conviction under section 7206(1), he is estopped in this proceeding to deny the fact that he willfully filed a false tax return for 1971 and the fact of the substantial omission of taxable income, which was the specific falsity charged. Considine v. United States,683 F. 2d 1285 (9th Cir. 1982); Considine v. United States,645 F. 2d 925 (Ct. Cl. 1981); Goodwin v. Commissioner,supra;Considine v. Commissioner,68 T.C. 52 (1977). Thus, two elements of possible civil fraud, a willfully false tax return and omission from that return of an amount known and believed to be taxable income, have been established for the year 1971 by collateral estoppel. However, we must still determine whether or not the false return with the omitted income was filed with the intent to evade taxes [18] and whether or not there was any underpayment of taxes to which the civil fraud addition of section 6653(b) attaches. [19]
*639 Thus, for 1971 as well as the other years we must make the same inquiry. We must consider the facts respondent relies upon to establish petitioner's intent to evade taxes, such facts being for the most part petitioner's peculiar and suspicious treatment of certain items of income and various deductions. On his original returns, petitioner omitted income of $15,000 from the Casperson Estate in 1969, $30,500 from the Heart and Lung Foundation in 1970, and over $64,000 from the Downey Estate and Wessel Trust in 1971. While petitioner had explanations for these various omissions, his explanations showed at the very least gross negligence in his preparation of his returns. Petitioner did not report the $15,000 payment from the Casperson Estate because he determined that he had over the years incurred expenses in connection with that estate that amounted to or exceeed that sum. On his first amended return for 1969, he reported the $15,000 in income but deducted over $9,000 in expenses that had been claimed and disallowed on audit in previous years. On his second amended return, he eliminated those expense deductions. For 1970 petitioner used a similar type of "netting" off the *640 return and again disregarded the annual accounting concept. Again he did not report payments totalling $30,500 that he received in 1970 from the Heart and Lung Foundation. He determined that the payments constituted reimbursement for expenses he had allegedly incurred over the years for work performed for that foundation. On his second amended return for 1970, petitioner reported the $30,500 as income and did not claim any offsetting expense deductions. In 1971 petitioner again omitted items of gross income from the Downey Estate and the Wessel Trust that he claims either he had not received, constructively or otherwise, or were not income to him. Those items will be discussed in detail below. Suffice it to say here, the amounts from the Downey Estate were constructively received by petitioner and were income to him in 1971. Also as to 1971 petitioner is collaterally estopped to deny that he willfully omitted a substantial amount of income from his return. Petitioner also omitted from his returns certain director's fees that he received in cash and certain state tax refunds. Petitioner's treatment of other items on his returns was also rather suspicious. Over a three-year *641 period he obtained certain stock by exercising an option he received as a participant in his company's qualified stock option plan. He acquired the stock by exercising the option at various times during each of the years 1969-1971, and each time he so acquired stock he wrote a letter to the company stating his intention to exercise the option. On his tax return for each year, petitioner used as the date of acquisition of his stock the date the option was granted to him (September 9, 1966) rather than the date on which he exercised the option and actually obtained the stock. Thus using this incorrect date, petitioner improperly claimed long-term capital gain rather than short-term capital gain each year. Petitioner testified that he simply picked up the wrong date and continued using that date thereafter, an explanation the Court found to be rather incredible for a lawyer familiar with the tax laws. There are also problems in regard to deductions claimed by petitioner. None of the disputed items of depreciation, business expense, farm expense, or contributions have been substantiated, a fact that might become important to the extent that petitioner is claiming any overpayment *642 of taxes or otherwise has any burden of proof as to the amount of the deficiencies determined. However, in deciding the fraud issue, we will not consider petitioner's failure to substantiate. While the rather liberal deductions petitioner claimed may have been negligently claimed, a good faith belief that he was entitled to claim the various items as business expenses does tend to negate any finding of fraudulent intent on his part. However, petitioner claimed 100 percent business use of an automobile and deducted the entire cost of the vehicle over the four-year period, yet some of the use of that automobile was personal and nondeductible. Some of the other items, particularly the so-called farm expenses connected with owning a horse, also appear to be purely nondeductible personal expenses. Thus petitioner's tax returns at the least were negligently prepared and at the most were suspicious. However, mere suspicion does not prove fraud, and we cannot find that respondent sustained his heavy burden to prove fraud by clear and convincing evidence. Since respondent has failed to establish fraud for any of the years before the Court, we of course do not reach the issue as to *643 whether or not the filing of amended nonfraudulent returns commenced the running of the three-year limitations period of section 6501(a), as we held in Klemp v. Commissioner,77 T.C. 201 (1981), on appeal (9th Cir. Nov. 2, 1981).[20] Absent fraud, the normal three-year limitations period began running on the filing of petitioner's original returns, and the statute of limitations bars the assessment and collection of any tax for the years 1969, 1970, and 1972. As to the year 1971, however, the six-year limitations period of section 6501(e)(1)(A) may be applicable. *644 Section 6501(e)(1)(A) provides for a six-year statute of limitations when a taxpayer omits items of income properly includable in gross income which exceed 25 percent of the gross income stated in the return. Respondent has the burden of proof to establish omissions sufficient to invoke this six-year statute of limitations. Stratton v. Commissioner,54 T.C. 255, 289 (1970); Bardwell v. Commissioner,38 T.C. 84, 92 (1962), affd. 318 F. 2d 786 (10th Cir. 1963); Reis v. Commissioner,1 T.C. 9, 13 (1942), affd. 142 F. 2d 900 (6th Cir. 1944). Petitioner's original return for 1971 reported gross income of $57,911.91 and his amended return for that year reported gross income of $79,057.20. He omitted from both of those returns at least $49,762.65 of gross income he received from the Downey Estate and Trusts, an omission amounting to 85.9 percent of the gross income stated in the original return and 62.9 percent of the gross income stated in the amended return. [21] Respondent has carried his burden to establish the requisite omissions of gross income if the six-year limitations period of section 6501(e)(1)(A) *645 is otherwise available in this case. In Klemp v. Commissioner,supra, the Court also ruled that when a fraudulent return, even one omitting more than 25 percent of gross income, was filed, such a return did not start the running of any statute of limitations, and that when an amended nonfraudulent return, reporting that omitted income was subsequently filed, the limitations period that commenced running was the three-year period of section 6501(a). Here, however, since we have not found fraud in the original return, *646 the Klemp ruling has no applicability, and the ordinary rule for a six-year period for substantial omissions of gross income governs. The present case, where there is no fraud but substantial omissions of gross income from both the original and amended return,is clearly distinguishable on its facts from Klemp.
Here the six-year limitations period of section 6501(e)(1)(A) applies to the year 1971. The notice of deficiency was issued on April 7, 1978, which was within six years of the filing of the original return for that year. [22] The year 1971 is open for the assessment and collection of tax. *647 Respondent's determination of the deficiency for 1971 is presumptively correct, and petitioner has the burden to show that the determination is incorrect. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). After concessions by petitioner, the issues in dispute in regard to the deficiency for 1971 include gross receipts of $15,000 from the Wessel Trust and $49,762.65 from the Downey family and deductions for depreciation, business expenses, farm expenses, and charitable contributions. In 1971 petitioner, as trustee, wrote three $5,000 checks payable to himself on the Wessel Trust account, and deposited those checks in his personal account. Respondent determined that the $15,000 was includable in petitioner's gross income under section 61. Petitioner argued that the first $5,000 was for distributions which he made to one of the beneficiaries of the trust and the other two $5,000 checks were loans which he repaid to the trust. Petitioner bears the burden of proving the $15,000 was not properly includable in his gross income, and has not carried his burden. The evidence shows that petitioner, as trustee, had control *648 over the checking account for the Wessel Trust and that in 1971 he wrote $15,000 in checks payable to himself and deposited them in his personal account at Barclays Bank. There is no evidence to support petitioner's testimony that $5,000 was a distribution for a trust beneficiary and that $10,000 was a loan. Petitioner testified that drafts were sent from Barclays Bank to Robert Wessel, a trust beneficiary who was in South Africa. No evidence was produced to connect the money deposited by petitioner in his personal account with any drafts which were allegedly sent to Robert Wessel. The Court kept the record open after the trial to permit petitioner to submit trust books of account, checks, or other documents that would support his argument. No documents were ever submitted. The only evidence in the record is petitioner's unsupported and self-serving testimony, which we did not find credible. We therefore hold that the $15,000 that petitioner received from the Wessel Trust was gross income to him. The next issue concerns the constructive receipt by petitioner of payment from the Estate of Boyce Downey and payment from the three trusts created by her for the benefit of her *649 husband and two children. On February 22, 1971, petitioner was issued four checks. One was from the Estate of Boyce Downey in the amount of $36,375.42; the second was from the trustees for Morton Downey in the amount of $4,778.57; the third was from the trustees for Catherine H. Cook in the amount of $4,304.33; and the fourth was the trustees for Christian Hohenlohe in the amount of $4,304.33. Petitioner returned all of these checks to Lawrence Cusack, an executor of the estate and a trustee for all of the trusts.
In October 1971, a special administrator was appointed by the New Haven, Connecticut, Probate Court to receive the funds which were to be used to pay petitioner for legal services he had rendered to the Estate of Boyce Downey.The executors issued a check for $36,375.42 to this administrator who notified petitioner that the money was available for him upon his written request. Also in 1971 three savings accounts were set up for petitioner's benefit to hold the funds which petitioner had refused to accept as payment for legal evidences he had rendered to the three trusts. Petitioner has not withdrawn any money from the three savings accounts and has not requested any *650 money from the special administrator. Respondent's position is that the money was constructively received by petitioner in 1971 and therefore includable in his gross income for that year. We agree. Petitioner, as a cash basis taxpayer, is generally required to include in gross income those items which he "actually or constructively" receives during the taxable year. Sec. 1.446-1(c)(1)(i), Income Tax Regs. The doctrine of constructive receipt is described in section 1.451-2(a), Income Tax Regs., which provides: (a) General Rule.--Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. * * * The rule of constructive receipt treats as taxable those items of income that are subject to the demands of the cash basis taxpayer even though *651 the taxpayer has not actually received them. Frank v. Commissioner,22 T.C. 945, 952-953 (1954), affd. per curiam 226 F. 2d 600 (6th Cir. 1955); Hamilton National Bank of Chattanooga v. Commissioner,29 B.T.A. 63 (1933). [23] The rationale for the rule, as stated earlier in Hamilton National Bank of Chattanooga,29 B.T.A. at 67, is so that "A taxpayer may not deliberately turn his back upon income and thus select the year for which he will report it." Apparently petitioner's failure to withdraw money from the savings accounts and to make a written request to the special administrator for payment was based upon his argument that acceptance of the money would prejudice his rights to further compensation. Each of the four checks that was mailed to petitioner and returned to Cusack bore the legend that it was "in full and final settlement and satisfaction of the fee(s) due as attorney…" for the estate and the trusts. Petitioner apparently argues that the checks were merely an offer and that his acceptance of them would constitute an accord *652 and satisfaction. If the checks were merely an offer to compromise, petitioner would not have been in constructive receipt of gross income.See Bones v. Commissioner,4 T.C. 415 (1944). The checks, however, were more than an offer of compromise.The amount of legal fees to which petitioner was entitled had been determined with finality. The Probate Court in New Haven, Connecticut, had ruled that petitioner was entitled to only an additional $36,375.42 for his legal services to the estate. Petitioner never appealed that ruling but merely filed an affidavit with the Probate Court claiming that the decedent, Boyce Downey, was not domiciled in Connecticut and that he was entitled to be paid more than the other lawyers who had worked for the estate. See footnote 8 above. Similarly, the Probate Court instructed the trustees of the three trusts to place the three checks in separate savings accounts for petitioner and that was done. There is no evidence that petitioner has ever pursued his claim for additional fees for legal services to the estate or to the three trusts in any other forum. The amount of money to which petitioner was entitled was conclusively established. *653 The New Haven Probate Court had ordered that the three checks totaling $13,387.23 be placed in savings accounts in petitioner's behalf, and the Probate Court appointed a special administrator to hold the $36,375.42 payment from the estate for petitioner. There is no doubt that petitioner would have been paid on his demand. He was therefore in constructive receipt of $49,762.65 in 1971. Nangle v. United States,136 Ct. Cl. 761, 145 F. Supp. 900 (1956). We therefore hold for respondent on this issue. Deductions are a matter of legislative grace and petitioner has the burden of proving he is entitled to the deductions he has claimed. New Colonial Ice Co. v. Helvering,292 U.S. 435, 440 (1934); Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. On his original 1971 return, petitioner claimed deductions for depreciation, other business expenses, farm expenses, and charitable contributions which were challenged on audit. Petitioner eliminated all of these claims on his amended return but reasserted them in both his petition and in his brief. However, petitioner presented little *654 or no evidence at the trial in support of these various deductions. Petitioner claims he is entitled to a depreciation deduction of $1,806.12 on his automobile. [24] At trial petitioner produced no evidence showing that any part of the automobile's use was for business. The statements in his brief are not evidence supporting his claim. Evans v. Commissioner,48 T.C. 704, 709 (1967), affd. per curiam 413 F. 2d 1047 (9th Cir. 1969); Rule 143(b), Tax Court Rules of Practice and Procedure. Petitioner has not met his burden of proving that he is entitled to any deduction for depreciation. On Schedule C of his original 1971 return, petitioner claimed $5,618.06 as business expenses. These expenses consisted of bar association dues, court and other fees, books and supplies, telephone, florist, club expense, travel, and car expense. These expenses were disallowed on audit on the grounds that the expenses were not substantiated and were not incurred by petitioner *655 in a trade or business. [25] Petitioner testified that all of his expenses were substantiated to the auditing agent, but petitioner produced no evidence at trial either to substantiate the amount or to support his claims that the alleged expenditures are deductible. It is well settled that a Tax Court proceeding is a trial denovo. Therefore, anything that petitioner may have produced during audit is not before us unless it is admitted as evidence during the trial. O'Dwyer v. Commissioner,266 F. 2d 575, 580 (4th Cir. 1959), affg. 28 T.C. 698 (1957); Greenberg's Expenses, Inc. v. Commissioner,62 T.C. 324, 327-328 (1974); Barry v. Commissioner,1 B.T.A. 156, 157 (1924). Unfortunately for petitioner, he did not introduce any evidence at *656 trial and we are not willing to accept his ipsedixit that these unsubstantiated amounts are properly deductible. We therefore hold that petitioner is not entitled to deductions for these alleged business expenses. Petitioner claimed $3,570.31 as a deduction for farm expenses on his original 1971 return. This claim was disallowed on audit because the agent determined it was an activity not entered into for profit. Petitioner eliminated this claim on his amended return but reasserted it on brief. Section 183 limits deductions attributable to an "activity not engaged in for profit." Petitioner has not substantiated the amount of the deduction he clamed on his original return and has not proved that he engaged in the activity for profit. He has not introduced any evidence concerning the manner in which his alleged horse breeding operation was carried on. [26] The only evidence introduced at trial on this issue was a copy of a complaint in a civil lawsuit filed against petitioner in the United States District Court for Massachusetts. The complaint alleged that petitioner was the owner of a stallion that had been used under a stud services agreement to breed one of the *657 mares owned by the plaintiff in that lawsuit. The last page of the complaint stated that petitioner was to have an interest in any foals resulting from this stud services. This documentary evidence proves only that petitioner was named as a defendant in a lawsuit. It does not establish that he was engaged in an activity for profit. Therefore, petitioner has not established that he is entitled to any deductions for farm expenses. Petitioner claimed a deduction for charitable contributions which he allegedly made in 1971 to Cooley Dickerson Hospital in the amount of $994.12 and to the Heart and Lung Foundation in the amount of $7,063. He eliminated these claims on his amended return but reasserted them in his petition and in his brief. At trial there was no testimony or documentary evidence concerning these alleged contributions. We therefore hold petitioner has not sustained his burden of proof and thus is not entitled to a deduction for charitable *658 contributions to the Heart and Lung Foundation or to Cooley Dickerson Hospital. We sustain respondent's determination of a deficiency of $41,070.64 for the year 1971 but not the addition under section 6653(b). Petitioner's return was negligently prepared and in disregard of the rules and regulations, but respondent has not asserted any addition under section 6653(a). To reflect the Court's holdings, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue, unless otherwise noted. ↩
2. The fraud additions were computed on the basis of petitioner's original returns, and the deficiencies were determined from the amended returns filed by petitioner. See Stewart v. Commissioner,66 T.C. 54, 58-59 (1976); George M. Still, Inc. v. Commissioner,19 T.C. 1072, 1076-1077 (1953), affd. per curiam 218 F. 2d 639↩ (2d Cir. 1955).
3. Petitioner filed joint returns with his wife for each of the years before the Court, and the statutory notice of deficiency was issued to both spouses, but with the fraud additions applicable only to petitioner. Mrs. Rinehart did not join in the petition to this Court.↩
4. Stipulation paragraph 10 erroneously refers to these adjustments as being made to the "amended" returns, but these total adjustment figures in paragraph 10 and in the first line of the table in paragraph 9 (Audit Adjustments before Amended Returns) are the same amounts. There is also another error in both paragraphs 9 and 10 of the stipulation because the total adjustments for 1972 are listed as $40,628.31, but the figures actually add up to $40,569. We have used the correct figure in the table above.↩
5. In finding that the amended returns for 1969, 1970, and 1972 were nonfraudulent and substantially correct, the Court has disregarded petitioner's ambivalent treatment of these amended returns, discussed below, whereby petitioner seems both to concede the adjustments made to his original returns and to disavow his apparent concessions. To the extent petitioner disavows his amended returns, he has failed to sustain his burden of proof on the various items of income and deductions. We are satisfied that the final amended returns for 1969, 1970, and 1972 substantially reflect petitioner's correct tax liability, and that there has been no overpayment of taxes, as petitioner contends, except for an overpayment of $860.73 for the year 1972.↩
6. Although the parties stipulated in paragraph 24 of their stipulation that petitioner received a "30-day suspended sentence," the transcript of the District Court proceeding and the judgment and probation/commitment order clearly show a one-year suspended sentence, and we have so found.↩
7. Petitioner did not report those amounts as income on his tax returns filed for those years. In 1976 petitioner wrote three checks in the amounts of $20,000, $25,000, and $50,000 payable to the Estate of Boyce Downey. He sent the checks to the estate but they were returned to him. Petitioner then reported the $95,000 on his 1976 Federal income tax return.↩
8. At the trial in this Court, petitioner tried to argue that the late Boyce Downey was not domiciled in Connecticut at the time of her death and that the probate court in Connecticut was not a court of record. We do not understand why petitioner failed to take action in the state courts and why he now makes such arguments in this Court. In any event there is no competent probative evidence of these matters in the record before this Court.↩
9. The check bore the legend: "In full and final settlement and satisfaction of balance of fees due as attorney for the executors of the Estate of Boyce Downey in accordance with decree of the Probate Court for the Distrct of New Haven, Connecticut dated January 11, 1971." ↩
10. Each of the checks bore the legend: "In full and final settlement and satisfaction of the fee due as attorney for the Trustees during the period from May 21, 1964 to April 25, 1969 in accordance with the decree of the Probate Court for the District of New Haven, Connecticut dated January 18, 1971."↩
11. The automobile cost $7,224.47. Petitioner deducted 100 percent of the cost between 1969 and 1972, claiming $1,806.12 for each year.↩
12. SEC. 6653. FAILURE TO PAY TAX.
(b) Fraud.↩--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.
13. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule.↩--Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, at any time after such tax became due and before the expiration of 3 years after the date on which any part of such tax was paid, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. 14. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION.
(c) Exceptions.-- (1) False Return.↩--In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. 15. Although phrased in slightly different terms, the essential elements of fraud under section 6501(c)(1) are the same as those under section 6653(b) dealing with the 50 percent civil fraud addition for any underpayment of tax "due to fraud." Considine v. United States,683 F. 2d 1285 (9th Cir. 1982); Considine v. United States,645 F. 2d 925 (Ct. Cl. 1981); Tomlinson v. Lefkowitz,334 F. 2d 262 (5th Cir. 1964), cert. denied 379 U.S. 962 (1965); Moore v. United States,360 F. 2d 353 (4th Cir. 1966), cert. denied 385 U.S. 1001 (1967); McGee v. Commissioner,61 T.C. 249, 256-257, 261 (1973), affd. 519 F. 2d 1121 (5th Cir. 1975); Amos v. Commissioner,43 T.C. 50, 55 (1964), affd. 360 F. 2d 358↩ (4th Cir. 1965). 16. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (e) Substantial Omission of Items.--Except as otherwise provided in subsection (c)-- (1) Income Taxes.--In the case of any tax imposed by subtitle A-- (A) General Rule.--If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph-- (i) In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services; and (ii) In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary or his delegate of the nature and amount of such item.↩
17. SEC. 7206. FRAUD AND FALSE STATEMENTS. Any person who-- (1) Declaration Under Penalties of Perjury.--Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter; or shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $5,000, or imprisoned not more than 3 years, or both, together with the costs of prosecution. ↩
18. Even if we treat the willfully false return as a "false or fraudulent return" as that term is used in secton 6501(c)(1), that section still requires that the false or fraudulent return be "with the intent to evade tax." See footnotes 14 and 15 above. ↩
19. In this case respondent has not relied upon the doctrine of collateral estoppel as to the elements of (1) intent to evade taxes and (2) an underpayment of tax. Thus, we need not and do not consider any possible differences among the various courts as to the full scope of the collateral estoppel effect of a conviction under section 7206(1). See and compare Goodwin v. Commissioner,73 T.C. 215 (1979), and Considine v. Commissioner,68 T.C. 52 (1977), with Considine v. United States,683 F. 2d 1285 (9th Cir. 1982), and Considine v. United States,645 F. 2d 925↩ (Ct. Cl. 1981).
20. There is a conflict between the Tenth Circuit and the Third and Fifth Circuits on this issue, and our Klemp case is now on appeal to the Ninth Circuit. Compare Dowell v. Commissioner,614 F. 2d 1263 (10th Cir. 1980), revg. 68 T.C. 646 (1977), and Commissioner v. Badaracco,693 F. 2d 298 (3d Cir. 1982), revg. T.C. Memo. 1981-404, a Memorandum Opinion that was issued the same day as Klemp and followed Klemp as the law in this Court, and Nesmith v. Commissioner,     F. 2d     (5th Cir. 1983), 83-1 USTC P9239, 50 AFTR 2d    , revg. T.C. Memo. 1981-561↩.
21. In addition, petitioner is collaterally estopped by his conviction under section 7206(1) to deny that he willfully filed a false return for 1971 and to deny the omission of income which was the specific falsity charged.Petitioner was convicted of stating on his return that his taxable income "was in the amount of $32,201.91, whereas, as he then and there well knew and believed, the taxable income * * * for the calendar, year 1971 was in the amount of $83,719.47." In other words, his taxable↩ income was understated by some 159 percent. However, for purposes of section 6501(e)(1)(A), we are concerned only with omissions of gross income.
22. The original return for 1971 was dated April 6, 1972, and was filed on or before April 15, 1972. The exact date of filing on or before April 15 is not disclosed by the record but is irrelevant. As a matter of law, any return filed before the last day for filing (here April 15, 1972) is considered as filed on such last day. Sections 6072(a), 6501(b)(1); Stuckey v. Commissioner,T.C. Memo. 1982-537; Akers v. Commissioner,T.C. Memo. 1981-633, affd. by unpublished opinion (2d Cir. July 20, 1982); Watson v. Commissioner,T.C. Memo. 1972-36; Scott v. Commissioner,T.C. Memo. 1958-113↩.The notice of deficiency issued on April 7, 1978 was thus issued within the six-year period.
23. See also Price v. Commissioner,T.C. Memo. 1963-172↩.
24. The claim was challenged on audit on the grounds that the automobile was petitioner's personal car. Section 262 provides that generally no deduction is allowed for personal expenses.↩
25. Petitioner's Federal income tax returns for 1965 through 1968 had also been audited. For those years all claimed business expenses had been disallowed on the grounds that they were either not incurred in a trade or business nor for the production of income. Although petitioner discuses those years in his brief, all of those years are closed and are not before us.↩
26. Section 1.183-2(b), Income Tax Regs., lists factors which generally are considered in determining whether or not an activity is engaged in for profit. Brannen v. Commissioner,78 T.C. 471, 507↩ (1982).